**MOTION IN LIMINE 4**
**EXHIBIT C**

Exhibit C
- 38 -

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

| | |
|---|---|
| INCREDIBLE FEATURES, INC.; JEFFERY R. WERNER; and BRIAN R. WOLFF, | ) CASE NO. ) 2:20-cv-00943-DMG-RAO-2574 ) |
| Plaintiffs, | ) ) ) ) |
| -vs- | ) ) ) ) ) |
| BACKCHINA, LLC; and DOES 1 through 10 inclusive, | ) ) |
| Defendants. | |

- - -

VIRTUAL DEPOSITION OF GARY ELSNER

Monday, December 20, 2021

Reported By:

Rachael M. Syska

Job No: 3874

Page 94

1       value the licensing and the fair market value
2       of photographs?
3                       MR. MAHONEY:  Objection.
4       Leading.  Vague.  Sorry, Mr. Elsner.  Give me a
5       minute to make my objection.  Now, go ahead.
6                       THE WITNESS:  I'm sorry.
7       You're correct, sir.
8           Q.    Great.  And I know we were having
9       issues with this before and I think it's just a
10      product of all of us not being in the same
11      room, but, I guess, maybe if we can just give a
12      beat between question and answer in case
13      there's an objection.
14          A.    Agreed.  The answer --
15          Q.    And so -- go ahead, Gary.
16          A.    The answer to the question that you
17      posed is the lack of degree, as you put it,
18      would have -- has no affect whatsoever on my
19      ability to opine on the fair market value of
20      the infringements in this case.
21          Q.    And as an example, you know, it
22      would be fair to say that, for example, an art
23      auction house like Christie's or Sotheby's,
24      those art auctioneers or those, you know, art
25      valuators maybe aren't capable of painting

Page 95

1        Rembrandt's or don't have, you know, painting

2        experience, but they certainly have the

3        knowledge and sophistication to value those

4        works of art; isn't that correct?

5                        MR. MAHONEY:  Objection.

6        Leading.  Vague.  Speculation.

7                        THE WITNESS:  I believe the

8        art auctioneers are using the past sales

9        history of the specific works of art that they

10       are auctioning off as a basis for their start

11       price or their valuations or fair pricing at

12       such auctions.

13            Q.   And whether those art auctioneers

14       could -- are skilled enough to create a piece

15       of artwork that is of similar nature or quality

16       is irrelevant to their ability to properly

17       value it, would you agree?

18            A.   I would agree that it's irrelevant

19       to their --

20                        MR. MAHONEY:  Objection.

21                        THE WITNESS:  -- irrelevant to

22       their ability to do so.

23                        MR. MAHONEY:  Okay.

24       Objection.  Vague.  Lack of foundation.

25       Speculation.  Leading.

Page 96

1          Q.    Mr. Elsner, could you explain the

2     difference between rights managed licensing

3     versus royalty-free licensing?

4          A.    I can.  Taking rights managed, the

5     concept of rights managed simply is rooted in

6     the name.  You want to manage the rights.

7     Therefore, when you license a rights-managed

8     image, it's required that you supply all sorts

9     of information including:  The media it's going

10    to be used in, the geographical territory it's

11    going to appear in, the way it's going to be

12    used, the length of time it's going to be used,

13    and the industry it's going to be -- that the

14    user's industry, as it were.

15               So all of those factors would be

16    required to issue a rights-managed license.

17               Contrarily, royalty-free is licensed

18    by the size of the image file.  There is a

19    standard license agreement that is almost

20    universal.  Individual companies do have tweaks

21    on terms of what's rights, but basically, you

22    can use the image -- the licenser or licensee,

23    rather, can use the image for literally any use

24    whatsoever without supplying the specifics.

25               So you're buying a file.  There's no

1       term, in terms of the period during which the

2       licensing can occur.  There's no restrictions,

3       with very few exceptions.

4               For example, a royalty-free image

5       typically cannot be used as a logo or typically

6       cannot be offered for resale.

7               But, generally, save those two types

8       of uses, the person that licenses a

9       royalty-free image can do whatever they want

10      with it and be covered by a license that they

11      get.

12          Q.   So if you were asked to value an

13      image for a royalty-free license, the fair

14      market value would essentially be the same no

15      matter who the customer or what the usage would

16      be; do I understand that correctly?

17          A.    That is correct.

18              MR. MAHONEY:  I'm going to

19      have to object to all of this.  Like, so are we

20      rewriting his report?  None of this is in his

21      report, so --

22              MR. CARREON:  Right.  I'm

23      going to bring it back to his report.

24      Absolutely, so --

25              MR. MAHONEY:  Okay.  Well, my

Page 98

1        objection is outside the scope of this report.

2        It asks for speculation, and you're leading

3        this witness, so I object.

4                        MR. CARREON:  Sure.

5            Q.    And so, Mr. Elsner, in contrast to

6        the sort of static nature of fair market value

7        in a rights-managed licensed -- excuse me.  Let

8        me strike that.

9                        So in contrast to the static nature

10       of the fair market value for a royalty-free

11       license, in a rights-managed license, the fair

12       market value is going to be very dependant on

13       who uses it, how they use it, what types of

14       rights they're using it for; do I understand

15       that correctly?

16                       MR. MAHONEY:  Objection.

17       Vague.  Leading.  No foundation.  This is

18       outside the scope of his report.  You can

19       answer, Mr. Elsner.

20                       THE WITNESS:  Thank you.

21       Additionally, you didn't mention the period of

22       time that the use would be occurring over.

23           Q.    Okay.  So that would be another

24       factor that would go into rights managed?

25                       MR. MAHONEY:  Objection.

Page 99

1   Form.  Foundation.  Vague.  Outside the scope

2   of his report.

3          Q.    So if you were asked to calculate

4   the fair market value of rights-managed images,

5   the fair market value for Customer A versus the

6   fair market value for Customer B and C might be

7   radically different because the rights at issue

8   for the license would be different; is that

9   correct?

10                  MR. MAHONEY:  Objection.

11  Form.  Foundation.  Leading.  Outside the scope

12  of his report.

13                  THE WITNESS:  The answer is

14  that would be correct.

15         Q.    Now, Mr. Elsner, on Page 10 of your

16  report, you mentioned that Incredible Features

17  only offers its images under a rights-managed

18  license model; is that correct?

19                  It's going to be on the second to

20  last paragraph there.

21         A.    Yes, that is correct.

22         Q.    So this distinction between

23  royalty-free and rights managed, that's

24  integral to the calculation of fair market

25  value for the images in this report; is that

Page 100

1        correct?

2                        MR. MAHONEY:  Objection.

3        Form.  Foundation.  Leading.  Outside the scope

4        of his report.

5                        THE WITNESS:  My answer is

6        that is correct.

7              Q.    Okay.  And you state, as such, in

8        your report?

9                        MR. MAHONEY:  That is a

10       misrepresentation.  Objection.  Form.

11       Foundation.  Leading, and outside the scope of

12       his report.

13             Q.    So, Mr. Elsner, in looking at and

14       calculating the fair market value of the images

15       that are at issue in this case, because they're

16       rights managed, you looked at things such as

17       length of use, type of use, things of that

18       nature; is that correct?

19                        MR. MAHONEY:  Objection.

20       Form.  Foundation.  Is this -- is there part of

21       this report that you're referring to?

22                        MR. CARREON:  I'm just asking

23       in general.

24                        MR. MAHONEY:  Okay.  Then let

25       me restate my objection.  Objection.  Form.

1    Foundation.  Outside the scope of his report.

2                    THE WITNESS:  My answer is

3    yes, that is correct.

4         Q.    And you arrived at an approximate

5    fair market value of $512 per photograph per

6    month; is that correct?

7         A.    Yes, that is correct.

8         Q.    And that's the fair market value of

9    the type of use that Backchina engaged in; is

10   that correct?

11                   MR. MAHONEY:  Objection.

12   Leading.

13                   THE WITNESS:  The answer is

14   yes, sir, it is.

15        Q.    And so because as we were talking

16   about how rights managed fair market value is

17   not necessarily a static calculation, that may

18   or may not be applicable across the board to

19   any use of these images ever; is that fair to

20   say?

21                   MR. MAHONEY:  Objection.

22   Form.  Foundation.  Leading.  Outside the scope

23   of his report.

24                   THE WITNESS:  It is unique

25   because of the fact they're involved in this

1           particular dispute.

2                   Q.    Okay.  And, Mr. Elsner, in

3           preparation for your report, I believe, you

4           listed in the document section in the beginning

5           of your report you reviewed various licenses

6           that were accomplished for the images at issue;

7           is that accurate?

8                   A.    That's correct.  Yes, sir.

9                   Q.    Okay.  And to your understanding,

10          those licenses were for -- were negotiated

11          prior to the use; is that correct?

12                  A.    Yes, that is correct.

13                  Q.    So that would be a situation where a

14          client or potential client would contact

15          Incredible Features and say, "Hey, I'm

16          interested.  What would you charge"?

17                        There would be a negotiation, a

18          discussion of what rights would be used, a

19          price that would be settled on, and then the

20          use would occur?

21                  A.    That's correct.

22                  Q.    Okay.  And that's in contrast to

23          your understanding of the situation with

24          Backchina, in which there was no pre-use

25          negotiation; is that correct?

Page 103

1                        MR. MAHONEY:  Objection.

2         Leading.

3                        THE WITNESS:  That is correct.

4         There was no pre-discussion or licensing prior

5         to the use.

6              Q.    And you listed one of the things

7         that you relied on in your report, which is

8         Exhibit 5, which is this chart of settlements

9         for copyright infringement.

10                       Your understanding is that all of

11        the settlements were for uses that had occurred

12        previous to payment; is that accurate?

13             A.    Yes.  All of these were

14        accomplished -- all the uses were accomplished

15        prior to licensing.

16             Q.    So would it be fair to say that

17        there's a difference between the fair market

18        value of a license that is negotiated prior to

19        use versus a price that's negotiated after a

20        use has already occurred?

21                       MR. MAHONEY:  Objection.

22        Form.  Vague.  Leading.  Outside the scope of

23        his report.

24                       THE WITNESS:  It was my

25        opinion that based upon the information that I

Page 104

1     was able to gather, whereas Plaintiff had

2     accomplished a large number of settlements that

3     involved negotiation and agreement, ultimately,

4     and payment where the uses were the same,

5     website uses, involving the same or similar

6     images from Plaintiffs' website and where the

7     uses were for a multiple months period, that

8     this was a very solid foundation and a way for

9     me to calculate fair market value in this

10    particular case.

11         Q.   Okay.  And does the fair market

12    value that you arrived at in your report --

13    sorry.  Let me strike that question.

14         A.   Okay.

15         Q.   The fair market value that you

16    arrived at in your report for $512 per image

17    per month, is that comparable to pre-use

18    licenses that you reviewed from Incredible

19    Features?

20              MR. MAHONEY:  Objection.

21    Leading.  Outside the scope of his report.

22              THE WITNESS:  As I discussed

23    previously in this deposition, in fact, I was

24    presented with a series of licenses where the

25    $500 price or per month license fee that I

Page 105

1      calculated compared favorably with higher

2      pricing that was accomplished by the Plaintiff

3      for similar or other images of theirs during

4      the period in question.

5           Q.    And you did, in fact, say on Page 13

6      of your report that your calculation was an

7      extremely conservative fair market value of the

8      amount of damages?

9           A.    Yes, sir, I felt that my

10     calculations were done in a conservative

11     manner.

12          Q.    Okay.  Now, you had some questions

13     during your deposition from Mr. Mahoney talking

14     about, I guess, speculating on what Backchina

15     would or not have paid potentially for these.

16               Do you remember?

17          A.    I recall those questions.  Yes, sir.

18          Q.    Do you think what Backchina would or

19     would not have paid is relevant to the fair

20     market value of the images?

21               MR. MAHONEY:  Objection.

22     Leading.

23               THE WITNESS:  No.  No, I do

24     not feel it's relevant.

25          Q.    And, in fact, to your understanding,

Page 106

1        Backchina did not pay any money for these

2        images; is that correct?

3                A.      That is my understanding.

4                        MR. MAHONEY:  I move to --

5        that -- well, we'll deal with that later.

6                        MR. CARREON:  Sure.  I'm just

7        asking what his understanding is.

8                        MR. MAHONEY:  Yeah.

9                Q.   Okay.  Give me just a moment here.

10       I apologize.

11                       MR. MAHONEY:  I do.  No,

12       actually, I have an objection about the last

13       question because it potentially involves Rule

14       408, protected communications.

15                       MR. CARREON:  Can you

16       elaborate on that, Trey?

17                       MR. MAHONEY:  Not on the

18       record.  Well, yeah.  Okay.

19                       MR. CARREON:  I'm just trying

20       to understand why you think it falls under 408.

21                       MR. MAHONEY:  Well, I mean, I

22       think -- I just want to protect my client here.

23       It's borderline -- it is borderline, but you

24       really shouldn't be asking him, you know, does

25       he know what Backchina has paid.  I mean, it's

Page 107

1      irrelevant, and it --

2                    MR. CARREON:  But if Backchina

3      paid something, we wouldn't be in this lawsuit,

4      right?  It would either not exist or would have

5      settled, right?  So --

6                    MR. MAHONEY:  Yeah.  Well, you

7      know, I mean, that's what I'm getting at is

8      this is kind of a question that doesn't have

9      anything to do with anything.

10                   MR. CARREON:  Well, but it

11     does because I'm asking him the fact --

12                   MR. MAHONEY:  I've stated my

13     objection.  Ryan, I've stated my objection.

14     Let's just move on.

15                   MR. CARREON:  Well, I'm trying

16     to make sure I address your objection on the

17     record.

18        Q.    Okay.  Going back to Exhibit 5 of

19     your report, Mr. Elsner, this is the chart of

20     all of the different settlements that were put

21     together.  These were settlements; is that

22     correct?

23                   They're not court judgements or jury

24     verdicts or anything like that?

25        A.    These were paid settlements that

Page 108

1      were negotiated between the parties.

2           Q.    Okay.   Great.   And that's what I was

3      getting at is, your understanding is that there

4      was negotiation, and this was an agreed-upon

5      amount between the parties to compensate for

6      these infringements?

7                     MR. MAHONEY:   Objection.

8      Leading.   Outside the scope of his report.

9                     THE WITNESS:   I asked that

10     question.   I was informed that this was not the

11     offer price, but rather, the negotiated

12     settlement fee that was paid.

13          Q.    And you had surmised that if the

14     infringers disagreed with a price, that they

15     would either try to negotiate a lower price or

16     they would proceed to some type of formal

17     adjudication; is that accurate?

18                    MR. MAHONEY:   Objection.

19     Form.   Leading.   Vague.   Outside the scope of

20     his report.

21                    THE WITNESS:   That is correct.

22     A settlement is basically -- and a payment of a

23     settlement is basically acknowledgement that

24     the buyer and the seller had come to an

25     agreement that was acceptable to both parties.

Page 109

1          Q.    So, in your opinion, the numbers

2     that are represented in this chart represent

3     what a willing buyer actually paid a willing

4     seller for the uses in question?

5                    MR. MAHONEY:  Objection.

6     Form.  Vague.  Leading.  Outside the scope of

7     his report.

8                    THE WITNESS:  In the case of

9     the 34 disputes that were settled that are

10    shown in this exhibit, yes, that was the

11    accomplished payment and acceptance.

12                   And, therefore, as I understand fair

13    market value and read the rulings and copyright

14    law that were provided to me, a reasonable

15    seller and a reasonable buyer came to a

16    reasonable agreement on price and accomplished

17    payment.

18         Q.    In determining the fair market value

19    of a license, in your experience, does the

20    amount of money that the purchaser makes affect

21    what the licensing value would or wouldn't be?

22                   MR. MAHONEY:  Objection.

23    Leading.  Outside the scope of the report.

24                   THE WITNESS:  No.  That would

25    have no effect on what the fair market value

Page 110

1    calculation should be.

2         Q.    And, in fact, in a traditional

3    licensing scenario where it's pre-use

4    negotiation, the sides would have no idea how

5    much the user of the intellectual property

6    would stand to gain; is that correct?

7                   MR. MAHONEY:  Objection.

8    Leading.  Outside the scope of his report.

9                   THE WITNESS:  That is correct.

10        Q.    You mentioned in your report -- and

11   correct me if I'm wrong on numbers, Mr. Elsner,

12   but you mentioned that you had personally

13   edited, in your estimation, approximately, a

14   million photographs over your 50-year career?

15        A.    That is correct.

16        Q.    And you viewed other libraries of

17   images for other licensing agencies; is that

18   correct?

19        A.    That is correct.

20        Q.    If you had to estimate how many

21   different libraries you viewed, what would your

22   estimate be?

23        A.    Over the course of my career and,

24   obviously, only starting when website

25   technology evolved for the particular -- this

Page 111

1      particular industry, I didn't keep count, but I

2      would say it's got to be close to a thousand,

3      if not more.

4           Q.    And when we say library, we're

5      talking about large collections of images?

6                     MR. MAHONEY:  Objection.

7      Leading.  Outside the scope of his report.

8                     THE WITNESS:  The collections

9      that I'm talking about would range from a

10     minimum of 75 to 100,000 images to maybe 30

11     million images.

12          Q.    And in your experience, having

13     viewed that much imagery, where does Incredible

14     Features imagery -- how does Incredible

15     Features imagery compare?

16                    MR. MAHONEY:  Objection.

17     Form.  Vague.  Leading.  And this is outside

18     the scope of his report.

19                    THE WITNESS:  As I mentioned

20     in my -- excuse me.  As I mentioned in my

21     report, I have never come across a licensing

22     collection even somewhat similar to the

23     Incredible Features' website, and I consider it

24     extraordinarily unique for the industry.

25          Q.    And in your experience, that

Page 112

1          uniqueness, would that translate into a higher

2          fair market value?

3                          MR. MAHONEY:  Objection.

4          Vague.  Outside the scope of his report.

5                          THE WITNESS:  I believe that

6          is the case, as evidenced by Exhibit 5, as

7          evidenced by the unique licensing that I saw,

8          and that Incredible Features accomplished

9          supply and demand, if the images aren't

10         available elsewhere, especially model-released

11         images -- not that Incredible Features can

12         demand any specific amount, but in the

13         negotiation of a license fee, they're in a far

14         better position than an agency that's trying to

15         license an image of a sunset.

16              Q.    And would that be because, in your

17         example of an agency that was trying to license

18         an image of a sunset, potentially some other or

19         multiple other agencies might posses similar

20         imagery so that would diminish their bargaining

21         power?

22                          MR. MAHONEY:  Objection.

23         Form.  Leading.  Vague.  Outside the scope of

24         his report.

25                          Just to be clear, when I say outside

Page 113

1       the scope of the report, I'm going to be

2       drafting a motion to eliminate to strike all

3       this stuff.  Okay.

4                    MR. CARREON:  Sure.  Okay.  Go

5       ahead, Mr. Elsner.

6                    THE WITNESS:  Using your

7       example or my example of a sunset, there are

8       probably -- I know, for sure, millions of

9       sunset images available throughout the world

10      for commercial licensing.

11           Q.   Whereas, to you knowledge, there are

12      not very many or any other images of, for

13      example, the thin skin images, which I think we

14      looked at earlier in the deposition?

15                   MR. MAHONEY:  Objection.

16      Form.  Leading.  Outside the scope of his

17      report.

18           A.   As I just testified a few moments

19      ago, I consider the Incredible Features website

20      quite unique.  And while I probably could dig

21      through 30 million image websites to come up

22      with some non-released images that could

23      conceivably, a few of them, be considered

24      similar in some way, I've never seen anything

25      like this before.

118

1    COMMONWEALTH OF PENNSYLVANIA    )
                                     ) SS

2    COUNTY OF BEAVER               )

3                    CERTIFICATE

4        I, Rachael M. Syska, a notary public in and for the Commonwealth of Pennsylvania, do

5    hereby certify that the witness, GARY ELSNER, was by me first duly sworn to testify the

6    truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken

7    at the time and place stated herein; and that the said deposition was recorded

8    stenographically by me and then reduced to typewriting under my direction and constitutes

9    a true record of the testimony given by said witness.

10

11        I further certify that the inspection, reading, and signing of said deposition were

12    waived by counsel for the respective parties and by the witness.

13        I further certify that I am not a relative, employee, or attorney of any of the

14    parties or a relative or employee of either counsel and that I am in no way interested

15    directly or indirectly in this action.

16        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 27th

17    day of December, 2021.

18

19                            Rachael M. Syska, Notary Public
                                        Court Reporter

20    Commonwealth of Pennsylvania - Notary Seal
          Rachael M. Syska, Notary Public
                 Beaver County

21    My commission expires February 25, 2025
            Commission number 1390978
    Member, Pennsylvania Association of Notaries

22

23

24

25

Exhibit C
- 60 -